IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **MARJORIE BARE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) **Civil No.**  14-cv-133-CJP[1] |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **Acting Commissioner of Social** | ) |
| **Security,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Marjorie Bare is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying her Disability Insurance Benefits (DIB) from her alleged onset date until February 5, 2010 pursuant to 42 U.S.C. § 423..

## Procedural History

Plaintiff applied for benefits on September 24, 2010, alleging disability beginning on August 14, 2008. (Tr. 13). After holding an evidentiary hearing, ALJ Michael Scurry issued a finding that plaintiff became disabled on February 5, 2010. (Tr. 13-23).  The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c).  See, Doc. 13.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ erred in determining plaintiff's credibility.

2. The ALJ erred in forming plaintiff's RFC.

3. The ALJ's decision was not supported by substantial evidence.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2]  For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  **42 U.S.C. §423(d)(3).**  "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.  **20 C.F.R. §§ 404.1572.**

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.  The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.  As is relevant to this case, the DIB and SSI statutes are identical.  Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.   The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, **649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  **20 C.F.R. §§ 404.1520;** *Simila v. Astrue*, **573 F.3d 503, 512-513 (7th Cir. 2009);** *Schroeter v. Sullivan*, **977 F.2d 391, 393 (7th Cir. 1992).**

If the answer at steps one and two is "yes," the claimant will automatically

be found disabled if he or she suffers from a listed impairment, determined at step three.  If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, **737 F.2d 714, 715 (7th Cir. 1984).**  See also, *Zurawski v. Halter*, **245 F.3d 881, 886 (7th Cir. 2001**) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.  It is important to recognize that the scope of review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**.  Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  See*, Books v. Chater*, **91 F.3d 972, 977-78 (7th Cir. 1996)** (citing *Diaz v. Chater*, **55 F.3d 300, 306 (7th Cir. 1995)**).

The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, **402 U.S. 389, 401 (1971).**  In reviewing for "substantial

evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, **103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, **597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

### The Decision of the ALJ

ALJ Scurry followed the five-step analytical framework described above. He determined plaintiff had not been engaged in substantial gainful activity since the date of her application. He found plaintiff had severe impairments of lumbar degenerative disc disease with L5-S1 herniation, status post fusion, and obesity. The ALJ determined these impairments did not meet or equal a listed impairment.

The ALJ found plaintiff had the residual functional capacity to perform work at the light level with some restrictions prior to February 5, 2010. (Tr. 16). The ALJ found that after February 5, 2010, plaintiff had the residual functional capacity to perform work at the light level with additional restrictions. (Tr. 21). Based on the testimony of a vocational expert (VE), the ALJ found plaintiff was unable to perform past work and prior to February 5, 2010, there were jobs that existed in significant numbers in the national economy that plaintiff could have performed. After February 5, 2010, the VE testified and the ALJ agreed that there were no jobs in the national economy plaintiff could perform. (Tr. 22-23).

**The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.  The following summary of the record is directed to the points raised by plaintiff.

**1. Agency Forms**

Plaintiff was born on March 8, 1964 and was forty-four years old on the alleged onset date. (Tr. 107). She was insured for DIB through December 31, 2012.[3]

According to plaintiff, her back injury, obesity, diabetes, high blood pressure, and depression made her unable to work. She was five feet five inches tall and weighed two hundred and eighty pounds. (Tr. 146). Plaintiff previously worked as a cook in a nursing home and in a county jail. (Tr. 147). She took several medications and as of September, 2010, she was taking Avandia, Byetta, Glipizide, and Metformin for diabetes, Citalopram for depression, Metoprolol for high blood pressure, Flexeril for muscle spasms, and Hydrochlorothiazide as a diuretic. (Tr. 148).

Plaintiff submitted a Function Report in 2010. (Tr. 167-75). She stated that she lived in her home with her son. Plaintiff's back hurt so badly that she had difficulty performing most basic tasks like laundry or cleaning the dishes. (Tr. 167). Most of her day was spent resting and she would occasionally make small quick meals like frozen dinners or sandwiches. (Tr. 168-69). She was able to

---

[3] The date last insured is relevant to the claim for DIB, but not the claim for SSI.  See, 42 U.S.C. §§ 423(c) & 1382(a).

drive and went to the store once or twice a month. It would take her about thirty minutes to get one or two items from a store. (Tr. 170). She claimed to have trouble lifting, squatting, bending, standing, reaching, walking, sitting, climbing stairs, and completing tasks. (Tr. 172). She could only walk for a few minutes with a cane before needing to rest. (Tr. 172-73).

### 2. Evidentiary Hearing

Plaintiff was represented by an attorney at the evidentiary hearing on July 9, 2012. (Tr. 30). She was forty eight years old at the hearing, unmarried, and lived at home alone. (Tr. 34-35). She had two sons and five grandchildren. She could no longer babysit her grandchildren due to her back problems, but they visited her occasionally. (Tr. 36).

She last worked as a head cook in a nursing home, where she worked for twelve years before injuring her back on the job. (Tr. 37). Plaintiff testified that she slipped on water at work and caught herself during the fall which caused her to rupture her back. She initially attempted to return to work, but was unable to do so. (Tr. 38). The only work she performed in the last fifteen years was as a cook. (Tr. 39). Plaintiff received workers' compensation benefits for her injury until 2011 when she received a settlement of approximately $150,000. (Tr. 40).

After her injury, plaintiff testified that she was confined to her recliner or bed most of the day due to pain in her back and legs. (Tr. 41-42). She had not sought work elsewhere. (Tr. 41). In June 2009, plaintiff stated that she had surgery where two rods, two discs, six screws, and parts of her hip bone were

placed in her back. The surgery relieved some leg pain but her back pain remained the same. (Tr. 42). Plaintiff attempted rehab and was doing well until she injured her back further while carrying weights at therapy. (Tr. 44-45). Thereafter, her doctors had her discontinue physical therapy. (Tr. 45).

On a typical day, plaintiff testified that she spends most of her time laying down or in a recliner with her feet propped up. She made tea and TV dinners but she had to sit down halfway through making either so that she could get pressure off of her back. If she attempted to do dishes she would rest her elbows on the counter to relieve some of the pressure. (Tr. 43-44). She testified that it took her all day to perform typical tasks because she had to frequently stop and rest. (Tr. 47).

A vocational expert (VE) also testified. The VE testified that plaintiff's past work as a cook was classified as medium skilled work. (Tr. 49).

The ALJ asked the VE a hypothetical where she was to assume a person with plaintiff's vocational and educational background and could perform light work but the person could only stand or walk for two hours in an eight hour workday. Additionally, the person could only occasionally climb ladders, ropes, scaffolds, stoop, kneel, crouch, or crawl. (Tr. 49). The VE testified that this person could perform jobs with a restricted range of sedentary work that exist in a significant number in the national economy. Examples of such jobs are clerical addresser, security monitor, and small products sorter. (Tr. 76).

The VE testified that if the person could not tolerate eight hours of work a day, five days a week, on a consistent basis and would require unscheduled absences and breaks at will, no jobs existed in the national or regional economies. (Tr. 50-51).

### 3. Medical Treatment

Plaintiff first presented to her treating physician's assistant, Carol Weiler, on June 17, 2007 complaining of back pain due to an injury at work the day before. (Tr. 383). She was treated by her orthopedic surgeon, Lawrence Leventhal, M.D., in October 2007. He prescribed physical therapy and recommended suitable levels of work activity. (Tr. 240) That month, plaintiff began physical therapy and continued regularly receiving treatment until January 2008. (Tr. 614-29).

From January 2008 through March 2008, plaintiff received epidural injections. (Tr. 264, 266-67, 270-72, 277). She felt they helped improve her symptoms at least 40%. (Tr. 344). In April 2008, Dr. Kenneth Wilkey, M.D., examined plaintiff and stated she was motivated to return to work and could perform work at the light level. Plaintiff's straight leg tests were negative and her gait, motor, and sensation were normal. (Tr. 344-45).

Plaintiff began physical therapy again in March 2008 and continued until September 2008. (Tr. 630-35, 637, 282-286, 296). She returned to Dr. Leventhal several times complaining of the same continued back pain, with some progress after therapy began. (Tr. 270-72, 277-80, 290-92). In August 2008, plaintiff

presented to Dr. Leventhal with a new popping and stinging sensation in her lower back. (Tr. 299). Dr. Leventhal found tenderness in her low back, positive straight leg raising at 70 degrees on the right while sitting, and flexion at 80% of normal range. (Tr. 300).

In September 2008, plaintiff returned to Dr. Leventhal and stated that physical therapy was no longer beneficial approximately two weeks prior. She had burning down her right heel and difficulty walking. She rated her pain at a five to six out of ten most of the time while on Darvocet and Medrol Dose Pack. (Tr. 307). Dr. Leventhal opined that plaintiff had reached a plateau with therapy and determined it was no longer beneficial. (Tr. 310). X-rays showed bilateral pars defects at L4-5 with grade 2 spondylolisthesis with flexion and extension. There was increased stress reaction along the anterior aspect of L5 and the L4 vertebrae was pivoting on the anterior corner of L5 with flexion. (Tr. 311). Dr. Leventhal felt fusion at the L4-L5 level was probably needed. (Tr. 310). In October 2008, plaintiff told Dr. Leventhal she wanted to consider surgery and she was referred to a tertiary center. (Tr. 315).

Plaintiff had an MRI in November 2008 that revealed chronic bilateral L4 spondylosis and grade 1 anterior spondylolisthesis of L4 on L5 and associated degenerative disc disease and facet arthropathy producing moderate L4-L5 foraminal stenosis. Plaintiff also had broad left-sided L5-S1 disc herniation extending laterally into the left L5-S1 neural foramen. She had a mild chronic

anterior wedge compression fracture at T11 but no acute fracture identified. (Tr. 317).

Later that month, plaintiff saw neurosurgeon Charles Wetherington for an evaluation. He felt plaintiff needed to receive injections in the right sacroiliac joint before more aggressive treatment was attempted. (Tr. 319). Plaintiff received a joint injection in December 2008, and an epidural steroid injection and nerve root block twice in January 2009. (Tr. 326-27, 331, 335-36). Immediately following the procedures plaintiff had significant improvement of the burning pain in her legs. (Tr. 333). However, in March 2009, plaintiff reported no significant improvements had been made with regard to her right-sided low back pain. (Tr. 337). The pain medicine physician, Dr. Brian Ogan, recommended further injections. (Tr. 338).

Dr. Wilkey examined plaintiff again in May 2009. (Tr. 346-47). Plaintiff had a limited range of motion in all planes, but had no neurological weaknesses. Dr. Wilkey felt that because conservative treatment had failed, plaintiff was a good candidate for surgery. (Tr. 346). He opined that plaintiff had an excellent attitude and he thought she would try her best to return to work. He also stated it may be difficult to find work due to plaintiff's obesity and having not worked for a while. Additionally, plaintiff would need at least three months to recover after surgery. (Tr. 346-47). Dr. Wilkey opined that plaintiff could return to work with limitations to lifting and carrying up to thirty pounds, and bending, twisting, sitting, standing, pushing, pulling, and driving as tolerated. (Tr. 347).

Dr. Wilkey performed spinal fusion surgery on plaintiff in July 2009. (Tr. 339-41). Plaintiff was initially scheduled for a T-lift only at L4-5, however during the procedure Dr. Wilkey observed severe osteoporosis and made a decision to perform a T-lift at L3-4 as well. (Tr. 339). The L4-5 disc fragment had completely degenerated and there was moderate to severe facet arthropathy at L3-4. (Tr. 340). Post operatively, Dr. Wilkey diagnosed plaintiff with grade 2 spondylolisthesis at L4-5. He prescribed pain medications and physical therapy. (Tr. 351). In October 2009, plaintiff presented to Dr. Wilkey with at least 50% improvement of pain. (Tr. 352). That December her pain levels were 70% improved. Dr. Wilkey returned plaintiff to work activity with restrictions of lifting no more than twenty pounds, working four-hour shift maximums, and bending, twisting, sitting, and standing as tolerated. She was to work no more than four hour shifts at a time. (Tr. 353).

In January 2010, Dr. Wilkey noted plaintiff sustained a setback and had plateaued at her current state of function. She felt therapy had aggravated her back pain and was taking four to five Darvocet a day. She had a waddling gait with a cane, had soreness on the right buttock and posterior thigh. Her straight leg test was negative. He had plaintiff discontinue therapy as she had done well up until this point. He felt plaintiff could return to limited duty work with a thirty pound carrying maximum, and sitting, standing, and twisting as tolerated. (Tr. 354).

In February 2010, plaintiff reported to the ER with increased pain. (Tr. 659). Her X-rays revealed that there was evidence of hardware failure and Dr. Wilkey again noted she had plateaued. (Tr. 659). In April, Dr. Wilkey discontinued therapy as he opined it may have aggravated her pain. Plaintiff had no radicular symptoms and her straight leg test was normal. (Tr. 355). Dr. Wilkey released plaintiff in September 2010 with permanent restrictions of bending, twisting, sitting, standing, and driving as tolerated and limited lifting and carrying to thirty pounds. (Tr. 357).

In February 2011, plaintiff saw Dr. Timothy Garrett, D.O., who noted she had an unsteady gait, used a cane, and had tenderness and a limited range of motion in her neck and back. He felt plaintiff was "probably operating at her maximum" and was disabled. (Tr. 509).

### 4. Opinion of Treating Doctors

In April 2011, Dr. Garrett filled out a functional capacity assessment for plaintiff. (Tr. 515-17). He felt plaintiff could not perform work that is more demanding than the sedentary level. His diagnoses were failed back syndrome, chronic pain, cervical arthritis, diabetes, peripheral neuropathy, and morbid obesity. (Tr. 515). He opined that plaintiff's impairments would cause pain and fatigue that would require breaks from work that would total an hour or more in the course of an eight hour workday. Additionally, plaintiff should avoid concentrated exposure of extreme cold, heat, wetness, and humidity. She should avoid even moderate exposure of hazards such as machinery or heights. (Tr. 516).

Dr. Garrett stated plaintiff's impairments or treatment would cause her to be absent from work more than three times a month. He reasoned that plaintiff's pain increases when she stands or walks and her pain medications impair her ability to operate any machinery. (Tr. 517).

Later that month Dr. Wilkey completed a form stating that he agreed with the opinions of Dr. Garrett. (Tr. 521).

### 5. RFC Assessment

State agency physician B. Rock Oh, M.D. assessed plaintiff's RFC in January 2011. (Tr. 501-07). He reviewed medical records but did not examine plaintiff. He believed plaintiff could occasionally lift twenty pounds and frequently lift ten pounds. He opined plaintiff could stand or walk for a total of two hours in an eight hour workday, and sit for a total of six hours in an eight hour workday. (Tr. 501). She was limited to occasional climbing of ladders, ropes, and scaffolds, and occasional stooping, kneeling, and crouching. (Tr. 502).

This opinion was seconded by Dr. Lenore Gonzalez, M.D., of Disability Determination Services (DDS) in April 2011. (Tr. 518-20).

### 6. Consultative Examinations

Dr. Raymond Leung, M.D., performed a physical consultative examination in January 2011. (Tr. 474-80). Dr. Leung noted that plaintiff was morbidly obese and brought a cane with her to the examination. (Tr. 475). With or without her cane plaintiff's gait was slow and she had a severe limp. She was able to walk fifty feet unassisted, tandem walk, heel walk, and toe walk. She was unable to hop and

could only squat 3/4 of the way down. Plaintiff had a decreased range of motion in her lumbar spine as forward flexion was limited to eighty-five degrees (Tr. 875-77). Her straight leg raise was limited to fifty degrees bilaterally. (Tr. 476). Dr. Leung's impressions were hypertension, diabetes, and a history of lumbar fusion at L3-4 and L4-5. (Tr. 476-77).

Dr. Harry Deppe, Ph.D., performed a psychological examination in January 2011. (Tr. 482-85). Dr. Deppe noted that plaintiff attended school until the tenth grade when she became pregnant and began working. (Tr. 482). She was oriented, her fund of general knowledge was good, and her abstract reasoning skills were within normal limits. (Tr. 483-84). Dr. Deppe felt plaintiff had the ability to relate to others, understand and follow simple instructions, perform simple repetitive tasks, and withstand the stress and pressures associated with day-to-day work activity. (Tr. 484-85). His diagnosis was adjustment disorder with mixed emotional features, in remission. (Tr. 485).

## Analysis

Plaintiff argues that the ALJ erred in his credibility assessment, RFC determination, and did not have substantial evidence to support his decision. As plaintiff relies in part on her testimony, the Court will first consider her argument regarding the ALJ's credibility analysis.

Plaintiff points out that the ALJ used the boilerplate language that has been criticized in cases such as *Minnick v. Colvin, 2015 U.S. App. LEXIS 249 (7th Cir. 2015), Parker v. Astrue*, **597 F.3d 920 (7th Cir. 2010), and** *Brindisi v.*

*Barnhart*, **315 F.3d 783 (7th Cir. 2003).** However, the use of the boilerplate language does not necessarily require remand. The use of such language is harmless where the ALJ goes on to support his conclusion with reasons derived from the evidence. **See,** *Pepper v. Colvin*, **712 F.3d 351, 367-368 (7th Cir. 2013);** *Shideler v. Astrue*, **688 F.3d 306, 310-311 (7th Cir 2012).**

It is well-established that the credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, **207 F.3d 431, 435 (7th Cir. 2000).** "Applicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the basis of the other evidence in the case." *Johnson v. Barnhart*, **449 F.3d 804, 805 (7th Cir. 2006).**

The ALJ is required to give "specific reasons" for his credibility findings. *Villano v. Astrue*, **556 F.3d 558, 562 (7th Cir. 2009).** It is not enough just to describe the plaintiff's testimony; the ALJ must analyze the evidence. *Ibid*. See also, *Terry v. Astrue*, **580 F.3d 471, 478 (7th Cir. 2009)**(The ALJ "must justify the credibility finding with specific reasons supported by the record."). If the adverse credibility finding is premised on inconsistencies between plaintiff's statements and other evidence in the record, the ALJ must identify and explain those inconsistencies. *Zurawski v. Halter*, **245 F.3d 881, 887 (7th Cir. 2001).**

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's

daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, at *3.

Although the ALJ considered a variety of factors in his analysis, his credibility determination cannot be upheld. First, the ALJ considered plaintiff's activities of daily living. (Tr. 19). The Seventh Circuit has repeatedly held it is appropriate to consider these activities but it should be done with caution. The ability to perform daily tasks "does not necessarily translate into an ability to work full-time." *Roddy v. Astrue*, **705 F.3d 631, 639 (7th Cir. 2013).** Plaintiff's daily activities can all be done with significant limitations and do not indicate she can complete an entire workday or workweek. The ALJ noted plaintiff reported she could do two small loads of laundry and visit with friends in her home. Additionally, her sister stated she could prepare simple meals and do laundry.

While the ALJ does not state that he believes these activities make her able to work, he fails to explain how they harm her credibility. First, these reported activities cannot harm her credibility because, as plaintiff points out, they were reported after the date when the ALJ determined plaintiff was disabled. (Tr. 19). The ALJ found plaintiff to be disabled after February 5, 2010 and her function report was dated November 7, 2010. Her activities would therefore have to support his conclusion that she was disabled at this point. Second, Plaintiff correctly notes that the ALJ failed to note how her statements were false or not corroborated by the record. He was required to explain how any of her reported

activities were not supported by the medical evidence. *Bjornson v. Astrue*, **671 F.3d 670, 647 (7th Cir. 2012)**(Stating an ALJ "must explain perceived inconsistencies between a plaintiff's activities and the medical evidence.").

The next portion of the ALJ's credibility analysis focuses on plaintiff's treatment history. He first looks at improvements plaintiff made during the course of treatment prior to February 5, 2010. However, as plaintiff points out, The ALJ's analysis concentrates solely on portions of the record that support his claim plaintiff was not disabled. For example, he stated that plaintiff improved with physical therapy, an exercise program, and aqua therapy but failed to acknowledge that the doctor added plaintiff was not ready to return to work on that same page. (Tr. 298).

The ALJ states that while plaintiff considered surgery her records show regular improvement. However he fails to reconcile how plaintiff had plateaued with physical therapy in September 2008 and the instability within her back made further therapy not beneficial. (Tr. 307). The ALJ does not discuss how plaintiff had decreased flexion and extension on several occasions. (Tr. 308, 320, 328). The Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, **743 F.3d 1118, 1123 (7th Cir. 2014)**.

The ALJ also focused on the portions of the record that indicated plaintiff could perform light duty work. The first reference the ALJ makes to "opinions

that she could return to light work" he cites a portion of the record from before plaintiff's alleged onset date. He then looks to opinions of Dr. Wilkey that plaintiff could return to work with a thirty pound lifting restriction and limitations of sitting, pushing, pulling, driving, and twisting as tolerated. As plaintiff points out, these limitations are the exact same that Dr. Wilkey gave plaintiff in September 2010, well after the ALJ had determined plaintiff was disabled. (Tr. 357). The ALJ makes no attempt to explain how Dr. Wilkey's opinion that plaintiff could work became less persuasive, or was less credible, after February 2010.

The ALJ relies heavily on Dr. Wilkey's opinions that plaintiff could perform light duty work with some restrictions. However, again, he picks and chooses which portions of the record to discuss within his credibility determination. For example, Dr. Wilkey stated that plaintiff was unable to perform any work after her surgery for at least six weeks, and kept her on a work restriction that reflects this suggestion. (Tr. 347, 351, 352). At the earliest, he felt plaintiff could return to full-time work three months post-operatively. (Tr. 347). December 2009, five months after plaintiff's surgery, was the first time Dr. Wilkey suggested plaintiff could return to any work, and he restricted her to four hour shifts at maximum. (Tr. 353). The ALJ references this specific doctor's note in stating plaintiff had 70% improvement, but fails to acknowledge the portion that significantly limits plaintiff's ability to work. (Tr. 19).

As plaintiff notes, these work restrictions do not support a finding consistent with full-time sedentary work. The VE testified no jobs existed if

plaintiff could not maintain work for eight hours a day, five days a week. (Tr. 50-51). The Seventh Circuit has also noted that, "a person who cannot work eight hours a day, five days a week, or the equivalent, is disabled." *Roddy,* **705 F.3d at 636.** Plaintiff was therefore, by definition, disabled for a portion of the relevant time. Since the ALJ relied heavily on Dr. Wilkey's work restrictions, he could have explained why he rejected this portion of the record or how plaintiff was not disabled in spite of it. Instead, he chose to ignore it entirely. This is error.

The ALJ is "required to build a logical bridge from the evidence to his conclusions." *Simila v. Astrue,* **573 F.3d 503, 516 (7th Cir. 2009).** ALJ Scurry simply failed to do so here. "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Kastner v. Astrue,* **697 F.3d 642, 646 (7th Cir. 2012), citing** *Steele v. Barnhart,* **290 F.3d 936, 940 (7th Cir. 2002).**

It is not necessary to address plaintiff's other points, but, as in *Pierce,* the determination of the weight to be given to plaintiff's treating physicians' opinions and of plaintiff's RFC will require "a fresh look" after reconsideration of plaintiff's credibility. *Pierce v. Colvin,* **739 F.3d 1046, 1051 (7th Cir. 2014).**

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## <u>Conclusion</u>

Plaintiff's motion for summary judgment is granted. The Commissioner's final decision denying Marjorie Bare's application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence <u>four</u> of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:  January 27, 2014.**

<u>**s/ Clifford J. Proud**</u>

**CLIFFORD J. PROUD**

**UNITED STATES MAGISTRATE JUDGE**

21